In the Matter of JOHN LEO SULLIVAN, an Attorney at Law, Respondent.

Fourth Department, January 11, 1933.

*Glenn W. Woodin*, for the petitioner.

*John Leo Sullivan* in person [*Foster Turnbull* and *John S. Lambert* of counsel], for the respondent.

THOMPSON, J. The petition charges the respondent with professional misconduct in six specific instances. Respondent filed his answer to the various charges and the proceeding was referred to an official referee to take proof of the issues and report. The learned referee has filed his report in which he finds respondent guilty of certain of the charges and not guilty of others. We now have a motion by the petitioner that such action be taken in the matter as may be deemed just and proper.

The transaction to which the first charge relates consists of respondent's employment by August Peterson (sometimes called John August Peterson), a resident of the Kingdom of Sweden, claimed to be the sole beneficiary, indirectly, of the estate of a deceased World War veteran. Respondent's retainer was effected through one Gunnar Niklasson, a neighbor of Peterson in Sweden, who, at Peterson's request, wrote to his brother, one Thomas Westland, then a resident of the city of Dunkirk, who took the letter to respondent, also then residing and engaged in the practice of his profession at Dunkirk, and his engagement by Peterson followed. It appears that decedent was survived by his father, as his sole heir at law and next of kin, but that the father died shortly after the death of the son, leaving him surviving his brother, the above-named August Peterson, and his widow who was the stepmother of the deceased veteran.

The estate consisted of the avails of a war risk insurance policy. The alleged beneficiary executed a general power of attorney to respondent, in pursuance of which respondent made a petition for letters of administration upon the estate of the deceased veteran, in which he alleged that decedent left surviving him, as his sole and only heir at law, the aforesaid August Peterson, and the court appointed a trust company as administrator of the deceased World War veteran's estate; to which insurance moneys in the amount of $8,535 were promptly paid. Thereafter the administrator, by authority of a decree of the court, paid the insurance moneys, less certain deductions, to respondent as attorney in fact of the beneficiary.

These deductions consisted of the expense of the proceeding in the Probate Court, including court costs, administrator's and attorney's fees in the sum of $522, the sum of $465 paid to Westland, as assignee of his brother, the above-named Gunnar Niklasson, by express order of the beneficiary, and " amount of claim filed

herein by John Leo Sullivan, as allowed by the court * * * $1,188.32," which had been disbursed by the administrator to respondent. Respondent, as attorney in fact of August Peterson, the beneficiary, at this time actually received the sum of $6,359.68, and he personally further received the sum of $1,188.32 on his claim, above mentioned. From the $6,359.68 he later paid Westland the sum of $1,000, upon the order of Peterson; he paid Peterson the sum of $2,372.43, and he retained the sum of $2,987.26, which was the balance of the fund, for his fees.

The above-mentioned claim of respondent for disbursements, which was supported by his oath, included, among other things, an item of $532.06, which he alleged he had paid to Westland; and the administrator filed an affidavit of Westland, which was prepared and submitted to it by respondent, in which Westland deposed that the account had " been incurred in investigations, in time spent and trips made to Winamac, Indiana, solely in connection with said estate, and that the same has been paid and advanced to me by John Leo Sullivan, attorney in fact of John August Peterson * * *." It is charged, among other things, that respondent did not pay and advance to Westland the sum of $532.06; that his affidavit and the affidavit of Westland, which he prepared, were both false, and that his conduct in submitting the affidavits and asserting his claim for that amount and obtaining payment of it was wrongful and fraudulent.

We are of the opinion that the charge of the petition in this respect is fully sustained in the testimony. Sometime after respondent received this money, Westland wrote him a letter to the effect that he had been informed that respondent had received the $532.06 item, above mentioned, and requiring its payment. Later, following the receipt of this letter, respondent wrote to his client in Sweden, saying, among other things: " Some time ago I received a letter from Mr. Westland making demand for an allowance in the amount of $532.06. I wrote him stating that in view of the fact that he had already received $1,000, that I thought that this allowance should properly belong to you." It is obvious that respondent had not " paid and advanced " this $532.06 to Westland or he would not have written this letter. Respondent makes no explanation or contradiction of the contents of the letter, nor does he contend that he ever paid the amount to the beneficiary. This evidence supports the testimony of Westland that the $1,000 payment was all he ever received from respondent.

In the third specification of the petition respondent is charged with having collected a $2,300 note made by one Ferrara to the LaMarcos, husband and wife, dated January 1, 1930, due six

months after date; and with having converted the money to his own use. On April 26, 1930, LaMarco, his wife and two sons consulted respondent about the note — left it with him — he gave them a receipt for it, and a little later they indorsed it. Respondent then indorsed it, caused it to be presented for payment at the bank where it was made payable on July 1, 1930, its due date, and it was protested for non-payment. On July 3, 1930, Salvatrice LaMarco, the wife, individually, and as agent for the husband, Santo LaMarco, signed an instrument, which recited, among other things, that the note had been previously sold and transferred to respondent for a good and valuable consideration, " and he is now the holder of the same." On July 7, 1930, respondent received $69 interest, then due on the note, and $1.25, protest fee, from Ferrara, its maker, took a renewal of it, payable to his own order, three months from its date, and put it up as security for a bank loan of $500 to himself. On July ninth respondent wrote the LaMarcos stating that he " called at Jamestown on July 7th at Mr. Ferrara's office prepared to serve papers in the action in Supreme Court on the note which you transferred to me. After talking with him for some time, he stated that he had some difficulty in raising money at the present time, at his request I went to the Farmers and Mechanics Bank at Jamestown and talked with President Rushworth. Mr. Rushworth stated that he was familiar with Ferrara's financial matters and he knew that he needed some time to negotiate a loan. Upon the statement of President Rushworth, I had agreed to give Mr. Ferrara some more time to arrange to raise this money." On July twenty-second he wrote: " I am in receipt of your letter of July 21st relating to the note of Mr. Ferrara. I have not heard from him since I saw you. I expect some money in a course of a short time." On October second he again wrote: " We have been negotiating for two or three days in an effort to get the money so that we could get this matter straightened up. We have made some progress and we hope to have the money, in any event, in the course of two or three weeks. I received a telephone call from a president of one of the banks at Jamestown asking for a discount of several hundred dollars on this note. In the event that we would discount it, we could get the cash at once, but I do not feel that we ought to discount it very much, so I am insisting upon some action." In none of these letters did he say that he had taken a note from Ferrara in renewal of the original, payable to himself or that he had deposited it with a bank to secure his own personal note for $500; nor did he at any time state any of these things to the LaMarcos. The renewal note became due October seventh, and respondent accepted the sum of $2,100 in full payment of it on that day.

Respondent did not write to the LaMarcos about the Ferrara note at any time after he received this money.

It is the contention of the petitioner that respondent not only kept the above facts, including the fact of the payment of this money, from the LaMarcos, but denied the receipt of the money, until sometime in the month of November. From this time on until respondent finally paid the amount that was accepted by the LaMarcos in satisfaction of their claim against him, they constantly, continuously and repeatedly demanded the payment of these moneys. On January 12, 1931, respondent paid $138, a year's interest on the $2,300, which, as appears above, was the principal sum of the note that the LaMarcos left with him. The same day he gave them a note for $1,900, which they testify they thought was a check. They returned it and received in its place a post-dated check in the same amount, which was dishonored when later presented. After the death of Santo LaMarco, the husband, in April, 1931, the matter was put in the hands of an attorney, who promptly and persistently required the payment of the money from respondent, and collected $600. Other promises to pay were not kept, and checks given were not good. On June 17, 1931, the attorney took the matter to the Bar Association. On the following July first, respondent gave three checks, which were subsequently paid and which satisfied the claims of the LaMarcos. It is respondent's contention, and the referee has found, that he was not aware that the matter had been laid before the Bar Association when he made these final payments.

Respondent's defense to this charge is that he at no time acted, nor was he consulted by the LaMarcos as an attorney; that they came to him for the purpose of selling the note, and that the transaction was in fact a legitimate sale of it by them to him.

In support of this defense, respondent produced the instrument, dated July 3, 1930, before mentioned. The body of it is in typewriting, but it bears the words, " Sullivan to pay by his note, in the amount of $1900 and $138 interest, in one year from this date or sooner," in respondent's handwriting. It is not signed by the respondent, but is signed by Salvatrice LaMarco, individually, and as agent for Santo LaMarco. It does not appear that the note mentioned was given, or that there was any conversation about it, at the time the instrument was executed, nor is there testimony explaining such omission. The LaMarcos testify that the instrument did not show the handwriting portions when it was executed. The LaMarcos, husband and wife, who owned the note, were foreign-born persons, and conducted their business with respondent through an interpreter. It is obvious that they went to respondent

in an effort to realize on the note and that he made efforts to dispose of it for them. The letters clearly show that he dealt with them on the basis of collecting the indebtedness Ferrara owed them on the note until after they began to press him to account. The sense of the letters is that he was reporting to his clients the progress he was making in collecting their note. The LaMarcos trusted him and followed his instructions. They indorsed the note and signed the transfer of it to him in faith that these things were necessary to enable him to collect their debt for them. Surely it cannot be claimed that in writing the letter of July ninth in which he stated that he called at Ferrara's office prepared to serve papers in an action on the note, respondent intended the LaMarcos to understand that it was his note, and not theirs, that he was ready to sue on or that he had any such thought. In thus holding that respondent was here acting for his clients and not for himself, effect may be given to the presumption that respondent's conduct was not at any time in violation of section 274 of the Penal Law, which forbids the purchase by an attorney of a thing in action with the intent and for the purpose of bringing an action upon it. We have not lost sight of the fact that while cross-examining the witness Tony LaMarco in this connection respondent propounded the following question: " And did you know that I had prepared papers in my own name to sue as owner of that note? " or that two days before writing this letter respondent had taken a renewal of the note in his own name, due in three months, and had posted it as security for a loan to himself.

There is no substance to the defense offered by respondent to this charge. The relationship set up was not that of vendor and vendee, but of attorney and client, with its attendant requirement of the utmost good faith on the part of the attorney, to be measured in the terms of the dependency of the client. Here we find the clients communicating with their lawyer through an interpreter, and to such extent limited in their ability to safeguard their own interests. The standard of duty of their attorney was thus increased and accentuated in the same manner and degree. Respondent's testimony fails to establish the purchase of the note by him, but shows rather that a sale was never contemplated and that he converted the note and its avails to his own use. We find no testimony indicating a contrary conclusion or casting a doubt upon the conclusion we have reached. In this specification we also decide that the charges of the petition are sustained by the testimony.

The facts involved in the fifth specification are as follows: Respondent represented a client against whom a garnishee execu-

tion had been lodged. Believing that it could be settled for fifty dollars, the debtor gave respondent that sum for that purpose. Through some misunderstanding, and at the debtor's request, the employer paid the amount collected under the garnishment, viz., $122.44, to respondent, which amount, together with the fifty dollars paid respondent by his client, equalled the amount of the judgment. The money was received by respondent February 3, 1930, by check. He cashed the check and instead of keeping the money separate and apart, he at once mingled it with his own funds. He did not procure a settlement or pay the money to the judgment creditor, nor did he pay it into court, or return it to the debtor's employer; but he kept it, until, on July 28, 1931, on demand of the employer, he returned the money.

We agree with the learned referee that respondent's statement that the fund was acquired and kept with the intention of paying it to the constable or to the court is not persuasive. Respondent offers no explanation for his failure to apply these moneys to the purpose for which they were intrusted to him within a reasonable time. The practice which his conduct demonstrates in this instance is highly improper and is disapproved. The charge of misconduct under this specification is sustained by the evidence.

We have examined the remaining charges alleged in the petition and the testimony in reference to each one. We do not here determine whether or not respondent was guilty of misconduct in any of them, having reached the conclusion that his conduct in the respects above considered requires the action we have determined upon.

In the respects we have mentioned, we hold that the respondent has been guilty of professional misconduct which establishes his unfitness to be a member of the bar. He should, therefore, be disbarred from practice, and his name stricken from the roll.

All concur, CROSBY, J., not sitting.

Order of disbarment entered.